UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDWARD FONTNEAU,<br><br>          Plaintiff,<br><br>          v.<br><br>THE TOWN OF SANDWICH;<br>GREGORY FAYNE, in his capacity<br>as Harbormaster of the Town Of<br>Sandwich; and<br>RON LARKIN, RICHARD JUDGE,<br>HANK SENNOTT, PAMELA TERRY and<br>WILLIAM DIEDERING, in their<br>capacity as members of the<br>Board of Selectmen of the Town<br>of Sandwich,<br><br>          Defendants. | CIVIL ACTION<br>NO.  02-10958-WGY |

MEMORANDUM AND ORDER

YOUNG, C.J.                                          March 12, 2003

     Americans love the sea.  They approach it with passions usually reserved for interpersonal relations.  It is not surprising, therefore, that legal cases are legion resolving disputes over tidal lands, waterways, beach frontage, and even the ability to stare at the sea.  This is one such case.

     This action arises out of the refusal of the Town of Sandwich Marina ("the Marina") to grant a slip lease to the plaintiff, Edward Fontneau ("Fontneau").  Fontneau and his father jointly owned a boat that was kept in a slip at the Marina.

**DOCKETED**

𝓁 6

Fontneau's father held the lease to the slip.  Upon his father's
death, Fontneau wanted the slip lease transferred to him.  The
Marina's policy, however, is not to allow transfers of slips
except, in limited cases, to the surviving spouse of a slip
lessee.  After his request for the lease was denied, Fontneau
brought suit against the Town of Sandwich ("Sandwich"),
Harbormaster Gregory Fayne (the "Harbormaster"), and Town Board
of Selectmen members Ron Larkin, Richard Judge, Hank Sennott,
Pamela Terry, and William Diedering (the "Board") (collectively
the "Defendants"), alleging five counts.

Count I asks this Court to annul the Habormaster's decision,
as upheld by the Board, not to grant the slip lease, on the basis
that it is arbitrary and capricious and exceeds the authority of
the decision-makers.  Compl. ¶¶ 27-30.  Count II complains of
breach of an alleged contract between Fontneau and Sandwich that
his slip lease, held during 2000 and 2001, would be renewable on
a yearly basis.  Id. at ¶¶ 31-40.  Count III alleges promissory
estoppel against the Harbormaster, based on an alleged oral
promise made in 2000 that Fontneau could remain in the slip
notwithstanding the Marina's policy.  Id. at ¶¶ 40-45.  Count IV
alleges negligent misrepresentation under Mass. Gen. Laws ch. 258
§ 1 et. seq., based on the same alleged representation.  Id. at

2

¶¶ 46-51.  Count V[1] -- upon which the jurisdiction of this Court
is based -- alleges violations of the Equal Protection clause of
the Fourteenth Amendment to the U.S. Constitution and Part 1,
Article 1 of the Massachusetts Constitution, based on the theory
that permitting slip transfers only to spouses constitutes sex-
based discrimination.  Id. at ¶¶ 47-49.[2]  The Defendants here
move for summary judgment on all claims against them [Docket No.
17].

## I.    INTRODUCTION

### A. Facts[3]

The Marina is located on property owned by the United States
Army Corps of Engineers ("Corps of Engineers") and is leased to
Sandwich.  Def.'s 56.1 Stmt. [Docket No. 19], ¶ 1.  The lease
requires that Sandwich's use of the property be subject to the
general supervision of the Division Engineer of the Corps of
Engineers.  Id. at ¶ 2.  It further requires that Sandwich
develop a fair and equitable plan for the issuance and assignment
of berths from a waiting list and that such plan be submitted to

---

[1] Due to an apparent error, this count is referred to as
Count IV.

[2] Due to an apparent error, the paragraphs in this count are
numbered as 47-49, rather than as 52-54.

[3] As is required in a motion for summary judgment, the
following facts are presented in the light most favorable to
Fontneau, the non-moving party.  All justifiable inferences have
been drawn in favor of Fontneau for the purposes of this motion.
See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1985).

the Division Engineer in writing for approval.  <u>Id.</u>; <u>see also</u>

Pl.'s Opp. to Summ. J. ("Pl.'s Opp.") [Docket No. 20], Ex. 6

(copy of lease), ¶ 32.  Pursuant to this requirement, Sandwich

has enacted and codified the Sandwich East Boat Basin Marina

Rules and Regulations (the "Marina Rules").  <u>See</u> Pl.'s Opp., Ex.

4 (copy of rules), ¶ 1.2.

The two most recent versions of the Marina Rules stringently

limit the transferability of slips.  The current version, which

the Harbormaster was instructed to enforce as of June 11, 1993

(the "1993 Marina Rules"), has the following provision:

> No slip shall be transferred except in the death of the
> individual in whose name the slip is assigned.  The
> surviving spouse may request the transfer of the slip to
> his/her name provided he/she is the owner of fifty-one
> percent (51%) of the vessel occupying the slip.

Rule 6.6, 1993 Marina Rules (attached to Pl.'s Opp. as Ex. 4).

The version prior to that, which was issued in 1992 and took

effect on January 1, 1993 (the "1992 Marina Rules"), contained

the following similar provision:

> No commercial permanent slip shall be transferable
> except within the immediate family.  Immediate family shall
> include spouse, children, father, mother, brother and
> sister.
> <u>No recreational slip shall be transferable except in</u>
> <u>the event of the death of the lessee holder, the surviving</u>
> <u>spouse may request the transfer of lease to his/her name</u>
> <u>provided he/she is the Owner of fifty-one percent (51%) of</u>
> <u>the vessel occupying the slip</u>.

Rule 6.6, 1992 Marina Rules (emphasis added) (attached to Defs.'

Mem. for Summ. J. ("Defs.' Mem.") [Docket No. 18] as Ex. 5).

4

Before the 1992 Marina Rules took effect, there were apparently no such restrictions on the transferability of slips.  Pl.'s Opp. to Protective Order [Docket No. 23], ¶ 11.

Fontneau's collision course with the Marina Rules began in January 1999, when his father passed away.  Fontneau's father had been a recreational seasonal slip holder at the Marina since 1959, and Fontneau and his father had co-owned a boat that occupied the slip for the past seven years.  Compl. ¶¶ 9-10.  Following his father's death, Fontneau wished to retain the slip that his father had held.  On February 8, 2000, the Harbormaster sent a letter to Fontneau acknowledging receipt of Fontneau's first half payment and his request to be considered for a larger slip, but also advising Fontneau that the rules of the basin did not allow a slip to be passed to a son or daughter.  Defs.' Mem., Ex. 4.  To that end, he apparently enclosed a copy of the 1993 Marina Rules and Regulations.  Id.  The letter further stated "[d]o [sic] to the late notice I will allow you to occupy the slip for the 2000 season, however, you should make plans after this season."  Id.

Fontneau alleges that in or about August 2000, the Harbormaster told him that he could remain in the slip and renew his lease yearly, despite his earlier statement that Fontneau should make alternative arrangements after the 2000 season. Compl. ¶ 14.  Specifically, Fontneau states that:

5

> On or about August of the year 2000, contrary to his
> earlier position, the Harbormaster told me that I would
> be allowed to continue to remain in the boat slip and
> renew my lease yearly, as is the customary practice in
> the marina.  I spoke to him in the harbor.  I asked him
> what when [sic] I would know if I could stay on in the
> harbor.  His answer was "You're all set."

Pl.'s Opp., Ex. 3 (Fontneau Aff.), ¶ 7.

Fontneau's slip lease was in fact renewed for 2001.  Compl.
¶ 16; see also Pl.'s Opp, Ex. 9 (copy of lease).  The
Harbormaster acknowledges that such a renewal required his
clearance, but states that any clearance was provided
inadvertently and was in violation of the Marina Rules.  Defs.'
Mem., Ex. 6 (Fayne Aff.), ¶ 5.  Accordingly, Fontneau leased the
slip during 2001.  Compl. ¶ 16.

Fontneau did not receive a lease renewal for the 2002 season
and, upon inquiry, was told by the Harbormaster that his lease
would not be renewed.  Id. at ¶ 21.  He appealed this decision to
the Board, as provided by the Marina Rules, and the appeal was
addressed on April 18, 2002 at a public meeting.  Id. at ¶¶ 22-
23.  Fontneau was unable to attend this meeting because of travel
difficulties.  Id. at ¶ 24.  Although his attorney requested that
the matter be continued until such time as Fontneau could attend
and speak on the subject of his alleged conversation with the
Harbormaster in August 2000, the Board voted at the meeting to
uphold the Harbormaster's decision.  Id. at ¶¶ 25-26.  Fontneau
subsequently attended the April 25, 2002 Board meeting to explain

6

his side.  Pl.'s Opp, Ex. 7 (minutes of April 25, 2002 Board

Meeting).  According to a newspaper account of the meeting,

Selectman Larkin told him, "I am sensitive to your situation, but

this is a black-and-white situation.  We moved [to uphold the

Harbormaster's decision] based on that.  The Corps of Engineers

holds us responsible that these slips don't stay in perpetuity."

Pl.'s Opp, Ex. 7 (*Sandwich Man Fights to Keep Family Boat Slip*,

Cape Cod Times, May 18, 2002, at A7).

### B. Procedural Posture

As noted above, the Defendants have moved for summary

judgment on all of Fontneau's claims.  The Court held a hearing

on this motion on December 12, 2002.  At that hearing, the Court

took the motion under advisement and granted Fontneau 60 days to

conduct limited discovery as to whether Rule 6.6 was validly in

effect at the time that the Harbormaster denied Fontneau's

request for the renewal of the slip lease for the 2002 season.

The Defendants have subsequently moved for an order protecting

them from responding to Fontneau's requests for additional

documents regarding the validity of Marina Rule 6.6.  See Defs.'

Mot. for Protective Order [Docket No. 22].  The Defendants argue

that they have already provided sufficient documentation of Rule

6.6's validity and that Fontneau's further requests are

burdensome and unnecessary.  Id. at ¶¶ 10-11.  Thus, at issue

before the Court are both the Defendants' Motion for Summary

7

Judgment and the Defendants' Motion for a Protective Order. As
the two motions essentially implicate the same underlying issues,
the Court addresses them in tandem.

## II.  DISCUSSION

### A.    Standard of Review

As this is a motion for summary judgment, the Court must
review "the entire record 'in the light most flattering to the
nonmovant and indulge[] all reasonable inferences in that party's
favor. Only if the record, viewed in that manner and without
regard to credibility determinations, reveals no genuine issue as
to any material fact may the court enter summary judgment."
Cadle Company v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997)
(internal citations omitted).

### B. Count I -- Review of Harbormaster's decision, as upheld by the Board

Fontneau seeks review under Mass. Gen. Laws ch. 249, § 4,[4]
alleging that the Harbormaster's decision not to renew Fontneau's
lease, as upheld by the Board, was arbitrary and capricious and
exceeded his authority. In support of this claim, Fontneau (1)
attacks the Harbormaster's interpretation of Rule 6.6 of the 1993
Marina Rules; (2) argues that neither the 1993 Marina Rules nor
the 1992 Marina Rules were validly enacted, such that the prior
regime -- in which there were no limitations on the

---

[4] The complaint refers to Mass. Gen. Laws ch. 247, but this
appears to be an error.

transferability of slips -- is still in place and mandates the renewal of his license; and (3) argues that the Rules are not being applied consistently and that he was singled out for an improper purpose.

The Court begins with Fontneau's contention that the Harbormaster's interpretation of Rule 6.6 of the 1993 Rules was arbitrary and capricious.  Fontneau argues that this rule "is subject to interpretation."  Pl.'s Opp. at 7.  As noted above, this rule states that "No slip shall be transferred except in the death of an individual.  The surviving spouse may request the transfer of the slip to his/her name provided he/she is the owner of 51% of the vessel occupying the slip."  Fontneau suggests that these two sentences "could be read separately allowing for an interpretation in favor of a co-owner of a boat in the event of one owner's death."  Id.

This argument is inventive, but must fail.  Fontneau seems to be suggesting either (1) that a slip freely can be transferred upon the lessee's death as long as the transferee owns 51% of the vessel, or (2) that a slip freely can be transferred upon the lessee's death, unless the transferee is a spouse, in which case the spouse must own 51% of the vessel.  Neither interpretation is supportable.  Under the first interpretation, there would be no need to refer specifically to surviving spouses, thus rendering most of the second sentence surplusage.  Under the second

9

interpretation, the Rules would be stricter for transfers to spouses than for transfers to non-spouses: a spouse would only be able to receive a transfer upon meeting the 51% ownership requirement, but no such requirement would exist as to other co-owners.  This distinction is arbitrary and meaningless.  This Court will not adopt an interpretation which renders part of the Rules meaningless or unnecessary.

Fontneau also argues, however, that Rule 6.6 was never validly authorized and enacted and thus cannot be enforced. Pl.'s Supp. Opp. [Docket No. 25], ¶ 8.  As noted above, Rule 6.6 apparently came into being with the 1992 Marina Rules and was subsequently modified slightly by the 1993 Marina Rules. Fontneau has indeed identified certain flaws in the enactment procedures for the 1992 Marina Rules and the 1993 Marina Rules, and a discussion of Fontneau's request for yet further discovery must start with the acknowledgment that the record before the Court does not conclusively prove that either the 1992 Marina Rules or the 1993 Marina Rules were properly authorized and enacted.

In the case of the 1992 Marina Rules, there is no evidence of approval by the Corps of Engineers, as required by Corps of Engineers' lease with Sandwich.  Moreover, there is no evidence of publication in a newspaper as required by section 250 of the By-laws of the Town of Sandwich, which state:

> The Board of Selectmen may from time to time, after a public hearing, make reasonable rules and regulations for the use of Town property.  Such rules and regulations shall take effect seven (7) days after their publication in a newspaper having general distribution in the Town of Sandwich.

Pl.'s Opp. to Protective Order, ¶ 9.

In the case of the 1993 Marina Rules, there is no evidence of publication, just as with the 1992 Marina Rules.  Moreover, while there is evidence that the Corps of Engineers approved the 1993 Marina Rules, there is only the *ipsi dixit* statement appearing on the face of the 1993 Marina Rules themselves that Board's approval was obtained.  There are no Board minutes supporting this statement, although there is a June 4, 1993 letter from the Town Administrator to that effect.  Def.'s Mot. for Protective Order, Ex. 4.

Even if the 1992 and 1993 Marina Rules were not validly issued and enacted, however, the Harbormaster's application of a policy that only permitted transfers of slips to surviving spouses accurately reflected the explicit policy of the Corps of Engineers.  As noted above, Sandwich operates the Marina under the supervisory authority of the Corps of Engineers, which must approve its regulations.  A letter from Richard C. Carlson, the Chief of the Construction/Operations Division of the Corps of Engineers, indicates that the Harbormaster's interpretation of Rule 6.6 is the only interpretation that would meet with the approval of the Corps of Engineers.  Defs.' Mem., Ex. 2.  In that

11

letter, Carlson objects to policies through which "family members
may retain a mooring space in perpetuity, thereby gaining a
permanent advantage over the general public." Id. He explains
that "We believe that an individual's prospects for obtaining a
mooring . . . should not be affected by such criteria as home
address, club membership, affiliation with specific commercial or
other enterprises, family relationships or the like (although we
do consider reasonable the premise that spouses constitute one
entity)." Id.[5]

As such, the Harbormaster's application of a policy that
allows transfers of slip leases in only one circumstance -- from
a lessee to a surviving spouse, provided that the spouse meets
the 51% ownership requirement -- is entirely consistent with the
expressed policy of the Corps of Engineers, as described above.
Indeed, this was one of the Harbormaster's expressed reasons for
denying Fontneau's application. Pl.'s Opp., Ex. 8 (Memorandum of

---

[5] Fontneau correctly points out that this letter was sent
not to the Town of Sandwich, but to the Town of Scituate, and
thus that it did not involve the particular matter of slip
licenses for the Sandwich Marina. Pl.'s Opp. at 6. Fontneau
does not argue, however, that this is not the policy of the Corps
of Engineers, nor that it is not equally applicable here.
Instead, Fontneau argues that "this correspondence is permissive
with regard to 'spouses as one entity' rule, but does not
requires [sic] it." Id. Indeed, the letter does not require
towns to permit transfers to spouses in certain situations. It
does, however, lead to the inescapable conclusion that there are
only two options sanctioned by the Corps of Engineers: allowing
transfers to no one; or allowing transfers only to spouses.
Neither interpretation allows for transfers to surviving children
such as Fontneau.

Gregory Fayne, March 4, 2002) (stating that "it would be a violation of Army Corps of Engineers policy of equal access" for Fontneau to maintain his lease.).

Accordingly, the Court rules that the Harbormaster's application of this policy was not arbitrary or capricious.  If anything, there is an argument that the Harbormaster's action in granting the 2001 lease to Fontneau was arbitrary and capricious, but -- not surprisingly -- Fontneau does not object to that action.

With regard to the Board's affirmation of the Harbormaster's decision, Rule 12.3 of the Marina Rules provides that appeals lie to the Board.  As such, it is within the Board's authority to uphold the Harbormaster's decision, and, as explained above, the Harbormaster's application of Rule 6.6 was not arbitrary or capricious.

Fontneau raises an additional point requiring consideration. He states that there are factual questions as to "whether the Plaintiff was singled out for an improper purpose" and "whether the rules and regulations are being applied consistently."  Pl.'s Opp. at 5.  In support of this argument, Fontneau attaches documents showing that the public copy of the waiting list has not been updated in a timely manner, that the list has some apparent irregularities, and that some individuals on the waiting list do not own boats -- all of which are not in accordance with

13

the Rules.  Id.; see also Fontneau Aff., ¶¶ 12-13; Pl.'s Opp, Ex.
5.  Even if these allegations are correct (as inferences drawn in
favor of Fontneau, the non-moving party) and some rules are not
being followed correctly, it does not follow that it is arbitrary
and capricious of the Harbormaster and the Board of Selectmen to
correct a previous failure to follow the Rules.  Failure to
enforce a rule or regulation in the past does not result in the
estoppel of present or future enforcement of the rule.  See Bldg.
Inspector of Lancaster v. Sanderson, 372 Mass. 157, 162-163
(1977).

The Court notes in passing Fontneau's claim that in the
administrative proceedings, "there were acknowledgements [sic] of
unfairness to the Plaintiff and discussion of changing the Rule
in the future."  Pl. Opp. to Protective Order, ¶ 14.  In support
of this assertion, Fontneau refers to the April 25, 2002 Board
meeting minutes, which simply state:

> Edward Fontneau spoke about the hearing the Board held
> last week regarding his slip at the Marina.  He was
> unavailable that evening and wanted the opportunity to
> explain his side to the Board.  Mr. Larkin said the
> Board sympathizes with him, however, based on the
> Marina Rules and Regulations they cannot change their
> vote.

Id., Ex. 7.

Even assuming that such a discussion occurred during the
administrative proceedings, it was entirely prospective and can
have no bearing on the decisions to follow Corps of Engineers
policy and not renew Fontneau's lease in 2002.  Hence, Fontneau

fails on this count, and the Defendants' motion for summary judgment on this claim is granted.

**C.   Count II - Breach of contract**

This count alleges the formation of a contract between the Harbormaster and Fontneau that Fontneau could renew his slip lease yearly and claims a breach of that contract.  Fontneau argues that the contract was formed orally and confirmed in writing -- the oral component being his conversation with the Harbormaster in August 2000 and the written component being his renewed lease in 2001.  Pl.'s Opp. at 8.

Actually, no written component is necessary.  A contract for the mooring of a vessel sounds in admiralty, Bird v. S.S. Fortuna, 232 F. Supp. 690, 691 (D. Mass., 1964) (Sweeney, J.); Selame Assocs. Inc. v. Holiday Inns, Inc., 451 F. Supp. 412 (D. Mass., 1978) (Maletz, J.), and maritime contracts do not require writing for validity.  Kossick v. United Fruit Co., 365 U.S. 731, 735 and n. 4 (1961).

The Defendants deny that the August 2000 conversation ever took place.  Fayne Aff. at ¶ 7 ("At no time did I promise Mr. Fontneau either orally or in writing that he would be allowed to remain in the slip and be able to renew the slip lease annually.").  As this is a motion for summary judgment, however, the inference must be drawn against the Defendants that the oral statement was made in August 2000 by the Harbormaster.

15

Nonetheless, Fontneau's own description of that statement
indicates that it cannot be construed as creating a contract.
Fontneau's affidavit simply states:

> On or about August of the year 2000, contrary to his
> earlier position, the Harbormaster told me that I would
> be allowed to continue to remain in the boat slip and
> renew my lease yearly, as is the customary practice in
> the marina.  <u>I spoke to him in the harbor.  I asked him
> what when [sic] I would know if I could stay on in the
> harbor.  His answer was "You're all set."</u>

Fontneau Aff. at ¶ 7 (emphasis added).

This, together with the lease for 2001 (Pl.'s Opp., Ex. 9),
comprises the <u>only</u> evidence available as to the terms of the
alleged contract for a renewable lease.  This is problematic, as
"[i]t is axiomatic that to create an enforceable contract, there
must be agreement between the parties on the material terms of
the contract, and the parties must have a present intention to be
bound by that agreement."  <u>Situation Mgmt. Sys. Inc.</u> v. <u>Malouf,
Inc.</u>, 430 Mass. 875, 878 (2000); <u>see also</u> <u>Mendel Kern, Inc.</u> v.
<u>Workshop, Inc.</u>, 400 Mass. 277, 280-81 ("[A]n intention to do
something is not necessarily a promise to do it.").

Here, several material terms are absent.  One such term is
the duration of this supposedly renewable lease.  It appears from
Fontneau's affidavit that he asked if he could stay on in the
harbor, and was told, "[y]ou're all set."  Fontneau's assertion
that he was told he could renew his lease yearly into the
indefinite future appears to be his own interpretation of this

16

three-word response to his question.   The written lease itself
contains no right of renewal and states only that it covers the
period from May 15, 2001 to October 15, 2001.   Pl.'s Opp., Ex. 9.
In support of his contention that the lease was renewable,
Fontneau points to the 1993 Rules' statement that "'Seasonal
Recreational Slip User' shall mean a recreational vessel owner
with a renewable recreational slip at the Sandwich Marina."   Rule
4.10, 1993 Marina Rules.   Pl.'s Opp at 8.   Fontneau's 2001 lease,
however, never refers to him as a "Seasonal Recreational Slip
User."   Pl.'s Opp., Ex. 9.   Moreover, the terms of the lease
state that the "Marina may refuse to rent dock space to any
person for any reason."   Id. at ¶ 24.   In short, there is no
basis for inferring -- from the Harbormaster's oral and written
statements -- the duration of the supposedly renewable lease
granted to Fontneau by the Harbormaster.

Second, there is no evidence of any price for this renewable
lease, other than the price for the 2001 boating season.   One
reason for the absence of an agreement on price is that the
Harbormaster's statement as recounted by Fontneau is better
characterized as an "agreement to agree" rather than as a
contract.   At best, the Harbormaster was promising to offer, on a
yearly basis, terms for the lease, which Fontneau would be free
to accept or reject at that time.

A further obstacle to construing either the oral or written statements as a contract is the lack of consideration given by Fontneau for the alleged promise by the Harbormaster that Fontneau would be able to remain in the slip and renew his lease each year.  See, e.g., Cass v. Lord, 236 Mass. 430, 432 (1920) (stating that for a contract to be valid and enforceable, it must be supported by consideration); Malihi v. Gholizadeh, No. Civ.A.973068B, 2000 WL 1299485, at *6 (Mass. Super. Mar. 16, 2000) (Hinkle, J.) ("A contract must of course be supported by consideration to be valid and legally enforceable as a contract.").  Fontneau has not indicated that he gave any consideration of any kind for this promise, a promise that notably expands the written terms of the 2001 slip lease for which he did pay.

Accordingly, Fontneau cannot prevail here on a contract theory.  The Defendants' motion for summary judgment on this claim is granted.

### D.   Count III - Promissory estoppel

This count relies on the same representation by the Harbormaster discussed in the previous section.  While the Defendants deny that the representation was made, the contrary inference must be drawn in the summary judgment context.

As the Supreme Judicial Court has explained, "an essential element under the promissory estoppel theory is that there be an

18

umambiguous promise and that the party to whom the promise was made reasonably relied on the representation." <u>Rhode Island Hospital Trust National Bank</u> v. <u>Varadian</u>, 419 Mass. 841, 848 (1995) (internal citations and quotation marks omitted). Fontneau's promissory estoppel claim thus fails for two reasons.

First, the ambiguity of the Harbormaster's alleged statement to Fontneau -- in that it failed to include such material terms as duration and price -- is as fatal to Fontneau's promissory estoppel claim as it is to his contract claim. <u>See id.</u> at 850 (stating that "an action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration").

Second, Fontneau's reliance on the Harbormaster's alleged promise was not reasonable, not only because of the ambiguity of the promise, but also because Fontneau himself had been informed that the 1993 Marina Rules forbade the transfer of the license to him.[6]   The Harbormaster had told him as much and had even enclosed a copy of the Marina Rules to that effect.   Given this indication that the Harbormaster lacked the authority to grant him a renewable lease, and Fontneau's failure to confirm that the

---

[6] Although Fontneau now challenges the validity of the process by which the Marina Rules were enacted, he certainly has not claimed that he knew or suspected back in 2000 that the Marina Rules might be unenforceable.

Harbormaster had and would continue to have the authority to waive the Marina Rules in his case, Fontneau could not have had more than a well-founded hope that the Harbormaster would continue to renew his lease in the future. Such a hope is insufficient to meet the requirements of a promissory estoppel claim. See Hall v. Horizon House Microwave, Inc., 24 Mass. App. Ct. 84, 93-94 (1987); Finn v. GenRad, Inc., No. CIV.A.20003292C, 2002 WL 532607, at * 6 (Mass. Sup. Ct. Jan. 17, 2002) (Lauriat, J.) ("A 'well founded hope' is not enough to support reasonable reliance . . . [the defendant's] assurances and offer letter do not satisfy these requirements because [the defendant] did not have the authority, and [the plaintiff] knew that he did not have the authority, to conclude an employment contract with him.").

For these reasons, Fontneau's promissory estoppel claim must fail. The Defendants' motion for summary judgment on this claim is granted.

### E.   Count IV - Negligent Misrepresentation Under Mass. Gen. Laws, chapter 258

As a prerequisite to bringing an action against a public employer for negligent misrepresentation under Mass. Gen. Laws ch. 258, a plaintiff is required to make presentment of his claim to the public employer within two years of the cause of action arising, and the claim is required finally to be denied by the employer. Mass. Gen. Laws ch. 258, § 4. The defendants state

that Fontneau failed to make such presentment and, as such, is not entitled to pursue this count.  Def.'s Mem. at 13.

Fontneau wrote a letter to George H. Dunham, Town Administrator for the Town of Sandwich, on March 18, 2002, outlining his complaint.  Pl.'s Opp. at 9; see also id., Ex. 10. This letter did not specifically mention a possible action in negligence, but did enumerate all the facts upon which Fontneau relies in this action.  In Doe v. Town of Plymouth, 825 F. Supp. 1102, 1111 (D. Mass. 1993) (Bowler, M.J.), such a letter was held sufficient for the purpose of section 4, despite a failure specifically to allege negligence.  Moreover, Sandwich took action to resolve the matter through the appeal hearing at the public meeting on April 18, 2002, and notified Fontneau of its decision.  Pl.'s Opp., Ex. 11.  This fulfills the other requirement of section 4 -- namely, that the public employer has finally denied the claim.  The requirements of Mass. Gen. Laws ch. 258, § 4 are therefore satisfied.

This allows the Court to consider the substance of this count.  To make out a claim of negligent misrepresentation, Fontneau must show that the Harbormaster, "in the course of his business, supplied false information for the guidance of another upon which [Fontneau] justifiably relied to his financial detriment and that the [Harbormaster] failed to exercise reasonable care or competence in obtaining or communicating the

21

information."   Cole v. New England Mut. Life Ins. Co., 49 Mass.

App. Ct. 296, 300 (2000).

In support of this claim, Fontneau again refers to the

alleged August 2000 conversation with the Harbormaster.   He

states in his complaint that he "relied on the representations of

the Harbormaster" and that he "suffered damages as a result of

his reliance on the misrepresentations made by the Harbormaster,"

in that he "did not seek alternate slip locations for his boat

and did not place his name on the waiting list for the Sandwich

Town Marina nor did he place his name on the waiting list for

other area marinas."   Compl. ¶¶ 49-50.

Even assuming the statement to have been made, however,

Fontneau's allegations do not make out a viable claim of

negligent misrepresentation.   First, even construing the facts in

Fontneau's favor, his reliance on the Harbormaster's assurance

was not justifiable.   Fontneau was aware of the Marina Rules'

prohibition against transfers to a son or daughter -- indeed, he

himself had received a copy of the 1993 Marina Rules.   Yet even

on his own evidence, he made no effort to confirm that the

Harbormaster would continue to have the ability to waive the

Marina Rules for him.   Moreover, Fontneau himself admits that

during the six-month period between February 2000 (at which point

Fontneau was told to find alternate arrangements for his vessel

for the 2001 boating season) and August 2000 (at which point the

22

supposed assurance was given), he lacked any firm assurance that
he would be able to keep the slip for the 2001 boating season.
Fontneau Aff., ¶ 6 ("On or about February 2000, Gregory Fayne,
the Harbormaster for the town of Sandwich notified me that I
would no longer have access to the boat slip after the 2000
boating season.  I went to the marina office to discuss the issue
with Greg.  I was told I could use the slip for 2000 and then we
would work together to try to work something out.")  Nonetheless,
throughout that period, Fontneau apparently did not seek
alternate slip locations, put his name on the Marina waiting
list, or put his name on another marina's waiting list.  As such,
Fontneau's assertion that he would have done so in the absence of
the Harbormaster's August 2000 alleged assurance strains
credulity.  Finally, although Fontneau alleges that he suffered
damages as a result of the Harbormaster's assurance, in that he
did not put himself on waiting lists for other marinas, he fails
to demonstrate how he suffered <u>pecuniary</u> loss as a result, which
is an essential element of a negligent misrepresentation claim.
<u>See, e.g.</u>, <u>Horvath</u> v. <u>Adelson, Golden & Loria, P.C.</u>, 55 Mass.
App. Ct. 1113 (2002) (unpublished opinion); <u>Golber</u> v. <u>BayBank</u>
<u>Valley Trust Co.</u>, 46 Mass. App. Ct. 256, 257 (1999).

Hence, Fontneau cannot establish the facts necessary for a
negligent misrepresentation claim.  The Defendants' motion for
summary judgment on this claim is granted.

**F. Count V -- Equal Protection**

This count is premised on the notion that Rule 6.6 treats married co-owners differently from unmarried co-owners.  Marital status, however, is not of itself a protected class.  A classification based on marital status is thus subject only to rational basis review.  <u>See, e.g.</u>, <u>Smith</u> v. <u>Shalala</u>, 5 F.3d 235, 239 (7th Cir. 1993); <u>In re Talmadge</u>, 832 F.2d 1120, 1125 (9th Cir. 1987).  Rule 6.6 clearly meets this standard, as it is rationally related to the legitimate purpose of keeping slips open to the public on a first-come, first-served basis, as opposed to letting slips remain indefinitely within the control of a single family.

Fontneau also attempts to argue that Rule 6.6 violates the Equal Protection Clause because it has a disparate impact on males.  Even if this is true, however, a showing of disparate impact alone does not make out an Equal Protection claim; a showing that the impact is traceable to a discriminatory <u>purpose</u> is required.[7]  <u>See</u> <u>Personnel Admin'r</u> v. <u>Feeney</u>, 442 U.S. 256, 272-74 (1979).  Equal protection claims brought under the Massachusetts Constitution are subject to the same standard.  <u>See</u> <u>Blixt</u> v. <u>Blixt</u>, 437 Mass. 649, 661 n. 17 ("The standard for

---

[7] The case to which Fontneau cites arises in the Title VII context (which does recognize claims of disparate impact), not in the Equal Protection context.  See Pl.'s Opp. at 10 (citing <u>Hill</u> v. <u>Human Rights Comm'n</u>, 735 F. Supp. 255 (N.D. Ill. 1990).

evaluating equal protection challenges under our State
Constitution is the same as the standard under the Federal
Constitution.") (2002).

Fontneau has not alleged that the policy was enacted with
the purpose of discriminating against men, nor set forth any
facts in support of that conclusion.  Accordingly, the
Defendants' motion for summary judgment on this claim is granted.

## III. CONCLUSION

Even if the Rules were not validly enacted, Fontneau cannot
succeed on any of the counts in his complaint.  The
Harbormaster's decision not to renew Fontneau's lease in 2002 was
neither arbitrary nor capricious, and did not exceed his
authority.  Rather, it was entirely in accordance with the stated
policy of the Corps of Engineers, under whose supervision
Sandwich operates the Marina.  As such, the Board's affirmance of
the Harbormaster's decision was likewise neither arbitrary nor
capricious.  Because the August 2000 statement and 2001 lease do
not constitute a contract, and the August 2000 statement cannot
give rise to promissory estoppel or negligent misrepresentation,
the non-renewal of Fontneau's lease in 2002 cannot be impugned on
those grounds.  Finally, neither Rule 6.6 nor the procedure
followed here implicate the Equal Protection Clause, as Fontneau
has made no showing that the policy was enacted with the purpose
of discriminating against males.

Accordingly, the Defendants' motion for summary judgment [Docket No. 17] is ALLOWED.   Given this disposition of the case, the Defendants' motion for a protective order [Docket No. 22] is DENIED as moot.


SO ORDERED.


WILLIAM G. YOUNG
CHIEF JUDGE